UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELSIE WEBB,

    Plaintiffs,

vs.

WESTBORN CHRYSLER PLYMOUTH
JEEP, INC.

    Defendant.
_____/

Civil Action No.
03-CV-71077-DT

HON. BERNARD A. FRIEDMAN

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and DENYING PLAINTIFF'S COUNTER MOTION FOR SUMMARY JUDGMENT**

**I.  Introduction**

    This is a class action consumer lending case, arising out of plaintiff's purchase of credit life insurance, in conjunction with an automobile purchase from defendant.  Plaintiff alleges that defendant violated the Federal Truth In Lending Act ("TILA"), the Michigan Credit Reform Act ("MCRA"), the Michigan Credit Insurance Act ("MCIA"), and the Michigan Motor Vehicle Sales Finance Act ("MVSFA"). Before the court is defendant Westborn Chrysler Plymouth Jeep, Inc.'s ("Westborn") motion for summary judgment and plaintiff Elise Webb's counter motion for summary judgment.  For the reasons set forth below defendant's motion is granted and plaintiff's motion is denied pursuant to Fed. R. Civ. P. 56.

**II. Statement of Facts**[1]

Plaintiff Elise Webb and others similarly situated, purchased used cars from defendant Westborn, under Retail Installment Sales Contracts ("RISC"), prepared and issued by defendant. Defendant regularly engages in credit sales where consumers repay loans in four or more payments. Defendant uses form RISCs to make TILA disclosures.

Defendant Westborn's principal owner is Doug Moore. He has served as Westborn's president and CEO for 24 years. Moore also established and owns the Susan Agency, an insurance company. Moore is its president, CEO, and sole employee. Sandy Luke maintains the Susan Agency's books and is "an unofficial observer" at the Agency.

Defendant Westborn sells insurance policies on behalf of the Susan Agency. The Susan Agency has no employees, does not do commission work, and does not solicit any outside business, it sells insurance exclusively for Westborn. All of the Susan Agency's insurance work is performed by Westborn's employees at Westborn's business. All of the insurance polices connected with Westborn are prepared, issued, and delivered by Westborn, to defendant Westborn's customers.

The Susan Agency's insurance purchase process is initiated by Westborn's finance managers. Owner Moore explained at his deposition that when a consumer purchases a car, the Westborn sales person attempts to sell the consumer a life insurance policy, along with the vehicle's financing. See Moore Dep. at 20-62. If a life insurance policy is sold, then Westborn generates insurance contracts on its own computers, along with the other vehicle purchase documents. Id. The Susan Agency's exclusive involvement in the process occurs when it forwards the insurance contracts to a third party. The Susan Agency's profits are paid directly to Moore. The Susan

---

[1] The facts are undisputed.

Agency does not pay Westborn for the use of Westborn's fixtures.  Id.

Westborn retains 45% commission on credit insurance policies issued.  See Luke Dep. at 41-42.  Moore admits that plaintiff Webb's TILA disclosure monetary amount includes the commission paid to the Susan Agency.  Plaintiff claims that the TILA disclosure does not identify the Susan Agency on the form, nor does it disclose that it receives a commission, or the amount of that commission.  Finally, Moore admits that the *only* credit insurance agency a consumer can purchase insurance from when buying a Westborn car, is the Susan Agency.

Defendant explains that every dealership in the State of Michigan, who sells credit life insurance, computes their charges in a manner identical to the one used and described by Westborn.  See Hearing Tr. 1/26/05 at 22.  The reason for this is that the governing Michigan statute requires that the credit life insurance policy must be sold by a separate entity.

Defendant's representatives explain that the insurance company provides the master policy to the insurance commissioner.  The life insurance company informs the insurance commissioner how premiums are calculated and rated.  The State of Michigan's insurance commissioner may either approve the insurance company's premium calculation method, or reject it, finding that it does not fit within the established rules.

Next, the state approved method is sent to a separate company[2] who creates a computer program for the dealer.  The program enables the dealer to plug in the relevant numbers and calculate a purchaser's insurance rates.  Thus, Westborn explains that it lacks the discretion to overcharge a consumer because the computer program contains the Michigan insurance commissioner's pre-approved calculation method.

---

[2] The California company is called Reynolds & Reynolds.

The Detroit Auto Dealers Association ("DADA") and the Michigan Automobile Dealers Association ("MADA") filed amicus curiae briefs in support of defendant's position in this matter. Both associations share the business interests of defendant.

DADA's members include more than 260 new, franchised, automobile dealers throughout metropolitan Detroit, and 98% of new automobile dealers in Wayne, Oakland, and Macomb counties. MADA is a statewide trade association representing 743 franchised new motor vehicle dealers or 90% of the 800 new car dealers in the state. MADA states that nearly all, or all, new motor vehicle dealers in Michigan offer credit insurance to all customers who finance a vehicle purchase.

Both DADA and MADA explain that their members will be greatly impacted by the outcome of this litigation because the dealerships have been selling credit life insurance, just like Westborn, for decades. According to DADA, credit life insurance is an attractive optional item for many car buyers who either lease or purchase a financed vehicle. DADA notes that although not all customers purchase credit life insurance, within the last six-years (the relevant statute of limitations period), hundreds of thousands of Michigan consumers have entered into identical or similar RISCs as Webb, and these contracts include the financing of credit life insurance premiums).

### III. Cross Motions for Summary Judgment

Plaintiff alleges that defendant violated TILA by disclosing commissions paid to third parties as the "amount financed" rather than as "finance charges." Plaintiff also alleges that TILA was violated based on violations of Michigan law when those premiums, disclosed as an "amount

financed," were charged at an unlawful rate, and included excessive commissions. Defendant argues that all of its practices were fully compliant with both federal and state statutes and that it is entitled to judgment in its favor.

### A. Summary Judgment Standard

Summary judgment under Fed. R. Civ. P. 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue [for trial] as to any material fact and that the moving party is entitled to a judgment as a matter of law. The determination is "whether the evidence presents a sufficient disagreement to require [a trial] or whether it is so one-sided that one party must prevail as a matter of law." Upsher v. Gross Pointe Public School System, 285 F.3d 448, 451-452 (6th Cir. 2002). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A party opposing a summary judgment motion must designate specific "evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. If the non-moving party, after reasonable opportunity for discovery, is unable to meet this burden of proof, summary judgment is proper. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### B. Finance Charges or Amount Financed

TILA and the associated Federal Regulations set forth guidelines for determining finance charges. Plaintiff's TILA violation claims, as to the credit life premium rate and excessive commission charges, are contingent upon whether or not defendant violated Michigan law. Finally, plaintiff's TILA violation claim, that defendant illegally paid commissions to third parties, does not

depend on state law.

> TILA defines a "finance charge" as:
>
> the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges.

15 U.S.C. § 1605(a).[3] Section 1605(b), "life, accident, or health insurance premiums included in finance charge," establishes that:

> [c]harges or **premiums for credit life**, accident, or health insurance written in connection with any consumer credit transaction **shall be included in the finance charges unless:** (1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and (2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written

---

[3] 15 U.S.C. § 1605(a) also contains "examples of charges which are included in the finance charge." The examples "include any of the following types of charges which are applicable:

(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.
(2) Service or carrying charge.
(3) Loan fee, finder's fee, or similar charge.
(4) Fee for an investigation or credit report.
(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.
(6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed.

> disclosure to him of the cost thereof.

Id. at § 1605(b). The Federal Reserve Board is empowered to carry out the purposes of TILA. See id. at § 1604(a). It promulgated Regulation Z, 12 C.F.R. § 226.1 et seq., which requires disclosures about the terms and costs of consumer credit. See Inge v. Rock Financial Corp., 281 F.3d 613, 619 (6th Cir. 2002)(quoting 12 C.F.R. § 226.1(b)).

> Regulation Z defines a "finance charge" as:
>
> The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.
> Charges by third parties. The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:
>> (i) requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or
>> (ii) **retains a portion of the third-party charge, to the extent of the portion retained.**

12 C.F.R. § 226.4(a). Under 12 C.F.R. § 226.4(b)(7), the cost of credit life insurance is ordinarily a finance charge, unless the provisions of § 226.4(d), are completely satisfied.

> Regulation Z, § 2266.4(d), explains "insurance and debt cancellation coverage." It

states:

> [V]oluntary credit insurance premiums. Premiums for credit life, accident, health or loss-of-income insurance may be excluded from the finance charge if the following conditions are met:
>> (i) The insurance coverage is not required by the creditor, and this fact is disclosed in writing.
>> (ii) The premium for the initial term of insurance coverage is disclosed. If the term of insurance is less than the term of the transaction, the term of insurance also shall be disclosed. The premium may be disclosed on a unit-cost basis only in open-

> end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.
> (iii) The consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified in this paragraph. Any consumer in the transaction may sign or initial the request.

12 C.F.R. § 226.4(d)(1).

Plaintiff argues that defendant failed to disclose "the actual cost of the appropriate coverage," violating § 226.4(d)(1)(ii), and instead charged plaintiff "excess coverage for credit life insurance." See Pl.'s Reply Br. at 19. See also Pl.'s Resp. Br. and Counter Motion at 15, ("Charges for excessive premiums and illegal commissions violate TILA, if not disclosed as finance charges.").

There is no dispute that defendant's "credit insurance charges" are presumptively finance charges. See 15 U.S.C. § 1605(a) and (b). Further, defendant admits that it disclosed the identified premium for credit life insurance as the "amount financed," rather than as a "Finance Charge," the term used in the Federal Regulations.

Defendant fully complied with the TILA, 15 U.S.C. § 1605(b), as well as Regulation Z, 12 C.F.R. § 226.4(d)(1), by disclosing the "amount financed" in the documents signed by the consumer and no charges were illegally retained. The undisputed evidence shows that defendant disclosed the premium for the initial term of the life insurance policy, as an "Insurance Premium" of $863.86. See Def. Br. at Ex. B. This Insurance Premium was disclosed in the Michigan Title, "Statement of Vehicle Sales," a document signed by plaintiff.

Plaintiff also contends that defendant violated TILA when it failed to disclose third party commissions as "finance charges." Plaintiff asserts that third party charges need only be "incident" to the extension of credit not a "condition of credit" to qualify as a finance charge which

8

must for disclosed. See 12 C.F.R. § 226.5(a)(1)(I); Inge, 281 F.3d at 624 (6th Cir. 2002).

The court finds that disclosure was not mandated because defendant met the exceptions set forth in the regulations. Westborn did not require the use of the Susan Agency as a "condition to the extension of credit." Importantly, the first page of plaintiff's RISC contains this acknowledgment. Thus, plaintiff's argument that consumers, including plaintiff, were "required to purchase insurance through its third party agency," lacks merit.

### C. Gross Credit Life Insurance

At issue is whether defendant's disclosure of "gross coverage" is permissible as a disclosure of the "actual cost" of plaintiff's coverage under Michigan law, i.e., whether or not Michigan law permits the sale of "gross" credit life insurance coverage. Plaintiff argues that the sale of "gross" coverage, the method defendant used for calculating the premium for credit life insurance, violates the Michigan Credit Insurance Act. Therefore, this method also violates the Michigan Motor Vehicle Installment Sales Finance Act, the Michigan Credit Reform Act, and TILA.

Gross credit life insurance coverage is coverage that includes the total interest accrued through the entire duration of the loan. The Michigan statute defines "Credit life insurance" as "insurance on the life of a debtor pursuant to or in connection with a specific loan or other credit transaction." M.C.L. § 550.603(1). Indebtedness is defined as the total amount payable by a debtor to a creditor in connection with a loan or other credit transaction. Id. at § 550.603(5). Further, the MCIA establishes that:

> **The amount of credit life insurance shall not exceed the indebtedness.** Where indebtedness repayable in substantially equal installments is secured by an individual policy of credit life insurance the amount of insurance shall not exceed the approximate unpaid indebtedness on the date of death and, where secured by a group

9

>policy of credit life insurance shall not exceed the exact amount of
>unpaid indebtedness on such date.

Id. at § 550.605.

There is no dispute that defendant sells credit insurance coverage for the amount owed and for all amounts to "become due and owing until the end of the loan term, i.e. the Total of Payments due under the note . . . ." Pl.'s Br. at 8. However, plaintiff contends that this practice is illegal because defendant cannot charge a premium for any amounts which are scheduled and will become due and payable in the future, but are "not yet earned by the creditor." Plaintiff asserts that those charges are illegal because they exceeded indebtedness. In addition, the charges reflect defendant's failure to:

>disclose the principal amount of the loan, as well as any prepaid (i.e., earned immediately payable) finance charges in the TILA disclosure statement provided at consummation . . . . the **Total of Payments.**

Pl.'s Br. at 8, citing 15 U.S.C. § 1638. Defendant does not contest that its disclosures encompassed "gross coverage," as described by plaintiff. However, defendant argues that "gross coverage charges" are permitted under Michigan law and therefore, they do not violate TILA nor Regulation Z, 12 C.F.R. § 226.4(d)(1).

Plaintiff argues that the MCIA only permits defendant to calculate the premium for credit life insurance using the "net balance decreasing term coverage" method, or a calculation based on the principle amount of the loan plus accrued interest.

In support of this argument, plaintiff relies on a 1964 Michigan Attorney General advisory opinion clarifying the definition of indebtedness. The attorney general opined that indebtedness "is the unpaid principal and interest accrued at any point in time during the life of the loan." Attorney General Opinion No. 4334 (1964). Based on this interpretation, plaintiff asserts

that defendant impermissibly imposed unearned finance charges on plaintiff at the commencement of the contract, by its sale of gross coverage.

For the reasons stated below the court finds that pursuant to the plain language of the statutes, prevailing interpretations by the relevant administrative agencies, and prevailing practices, defendant's sale of gross coverage credit life insurance is permitted in the State of Michigan and that defendant has not violated any of the relevant state or federal statutes.

First, plaintiff's reliance on the 1964 Michigan Attorney General Opinion is misplaced. The 1964 opinion, plaintiff's sole authority for this argument, is not relevant to the instant transaction because it interpreted the MCIA as it related to loans made under the Regulatory Loan Act. Therefore it lacks relevance to the instant statutes, particularly the MVSFA. Finally, unlike administrative agencies, Attorney General opinions are not entitled to the deference afforded to agencies which are specifically charged with interpreting and enforcing a particular act.

Second, the evidence shows that the sale of "gross coverage" insurance has been the prevailing practice in Michigan for decades, and that the relevant administrative agencies, charged with enforcing the statutes at issue, have condoned it.

In Michigan, the Office of Financial and Insurance Services ("OFIS"), formerly known as Financial Institutions Bureau ("FIB"), interprets and enforces the Michigan Credit Insurance Act, and reviews the practices of auto dealers who sell credit life insurance. The OFIS's interpretation of the MCIA, permits the sale of gross balance decreasing term coverage. The former Deputy Commissioner in charge of FIB's Office of Policy & Consumer Affairs and the regulation of non-depository financial services licensees, Murray Brown, submitted an affidavit explaining the

11

OFIS's familiarity with the statutory language and dealership practices.[4]  See DADA Br. Ex. A. (Brown Aff.).

It is well settled that federal courts must defer to an administrative agency's interpretation of the statutes it enforces.  See Chevron U.S.A., Inc. V. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843 (1984); Michigan Bell Telephone Co. v. MFS Intelenet of Mich., 339 F.2d 428, 433 (6th Cir. 2003).  In Gall v. American Heritage Ins. Co., Inc., 3. F. Supp. 2d 1344, (S.D. Ala. 1998), the district court was asked to determine whether the sale of gross balance decreasing coverage was lawful.  The court held that "[d]eference to the enforcement agencies' interpretation is especially warranted where, as here, the long-standing interpretation has controlled how the public has conducted its business."  Id. at 1351.  The instant case reflects a similar situation, where hundreds of dealerships in the State of Michigan have sold "gross coverage" for years, in reliance on the administrative agencies' statutory interpretations.  Therefore, this court defers to the OFIS's interpretation of the statutes and finds that the method defendant used to calculate credit life insurance premiums is legal and reflects almost thirty years of accepted practices in the State of Michigan.

The court also defers to the Michigan Insurance Commissioner's approval of the use of "gross coverage," by defendant and other Michigan automobile dealers.  Pursuant to the statute, defendant like all dealerships was required to file its insurance documentation with the commissioner.  See M.C.L. § 550.612.[5]  Defendant, following the statute, submitted its formula for

---

[4] Brown has held various positions with the FIB between 1968 and 1997.  He drafted consumer finance legislation, and was involved with periodic audits of automobile dealers who sold group credit life insurance based upon the gross balance decreasing term method.

[5]
 M.C.L. § 550.612 states that:
  All policies, certificates of insurance, notices of proposed insurance,

calculating insurance premiums, and filed all of the relevant documents with the commissioner. The undisputed evidence shows that defendant lacked discretion in its computation of those premiums. The commissioner could have rejected defendant's documents, "if the benefits provided therein were not reasonable in relation to the premium charge or if it contains provisions which are unjust, unfair, inequitable, misleading, deceptive or encourage misrepresentation of such policy." M.C.L. § 550.613. Moreover, the statute provides that the insurance commissioner could even have required defendant, as the insurer to refund plaintiff's money, or plaintiff could have used the statutory administrative appeals process to contest the commissioner's findings. See M.C.L. § 550.618.[6] The

---

        applications for insurance, binder, endorsements and riders shall be filed with the commissioner of the state in which the policy is issued.

M.C.L. § 550.613 states in its entirety that:
        The commissioner within 30 days after the filing of all policies, certificates of insurance, notices of proposed insurance, applications for insurance, binders, endorsements and riders, in addition to other requirements of law, may disapprove any such form if the benefits provided therein are not reasonable in relation to the premium charge or if it contains provisions which are unjust, unfair, inequitable, misleading, deceptive or encourage misrepresentation of such policy.

[6]

M.C.L. § 550.618 states that:
        Each insurer issuing credit life insurance or credit accident and health insurance shall file with the commissioner its schedules of premium rates for use in connection with such insurance. Any insurer may revise such schedules from time to time, and shall file such revised schedules with the commissioner. No insurer shall issue any credit life insurance policy or credit accident and health insurance policy for which the premium rate exceeds that determined by the schedules of such insurer as then on file with the commissioner. The commissioner may require the filing of the schedule of premium rates for use in connection with and as a part of the specific policy filings as provided by sections 12 to 17. Each individual policy, group certificate or notice of proposed insurance of credit life insurance and credit accident and health insurance shall provide that in the event of termination of the insurance prior to the scheduled maturity date of

13

commissioner approved defendant's documents and calculation method. The commissioner's approval of defendant calculation methods is also entitled to deference by this court.

The briefs submitted by amicis DADA and MADA explain that defendant Westborn calculates its premiums using the same method as every other auto dealership in the State of Michigan. See DADA Br. at 2, citing A Primer on Consumer Credit Ins., Anthony Rollo, Consumer Finance Law Quarterly Report, Spring 2000. This method is also accepted in the Uniform Consumer Credit Code and in model legislation promulgated by the National Association of Insurance Commissioners. Finally, in 1996 a study found that defendant's calculation method is accepted as legitimate in 42 states (including Michigan), according to state statutes and state regulatory agencies. See McCullar v. Universal Underwriters Life Ins. Co., 687 So.2d 156, 167 (Ala. 1996)(Hooper, J. Dissenting).

Finally, other jurisdictions with nearly identical statutory language have considered the definition of "indebtedness" and support defendant's position. For example, the Georgia Supreme Court validated the issuance of gross coverage, under nearly identical statutory language as here in Michigan. It noted that since the legislature authorized coverage up through the amount of the "unpaid indebtedness on the date of death," gross decreasing term coverage was specifically

---

the indebtedness, any refund of premium due shall be paid or credited promptly to the person entitled thereto: Provided, however, That the commissioner shall prescribe a minimum refund and no refund which would be less than such minimum need be made. The formula to be used in computing such refund shall be filed with the commissioner. If a creditor requires a debtor to make a payment in connection with credit life insurance and credit accident and health insurance and an individual policy or group certificate of insurance is not issued, the creditor shall immediately give written notice to such debtor and shall promptly make an appropriate credit to the account.

encompassed and deemed permissible.  Printis v. Bankers Life Ins. Co., 583 S.E.2d 22, 23 (Ga. 2003).  A Florida court also found that "total of payments" credit life insurance coverage, although exceeding the principal balance of the loan, was permissible, and not in conflict with the state's statute.  Robertson v. P.H.F. Life Ins. Co., 70 So.2d 555 (Fla. App. 1997).

For all of these reasons, the undisputed evidence shows that defendant's calculation methods were fully complaint with prevailing interpretations of Michigan statutes.  Thus, defendant did not violate Michigan laws, and therefore, it did not violate federal law.

### D. Commissions on Credit Insurance

Plaintiff claims that under Michigan law, defendant and its personnel may not benefit from indirect commissions, and that the Susan Agency is an illegal sham corporation.  Based upon these allegations, plaintiff concludes that the sale of credit life insurance, by dealer-related "sham" agencies runs afoul of the MVSFA's "indirect commission" prohibitions.  See M.C.L. § 492.131(c).  Finally, plaintiff claims that by this violation of Michigan law, defendant also violates TILA, for improperly disclosing unlawful commissions as "amounts financed."

The MVSFA limits certain charges to consumers and renders prohibited charges to consumers void.  See M.C.L. § 492.131.  Plaintiff contends that this means that the Act absolutely prohibits "kickbacks" and commissions, whether directly imposed or indirectly imposed, within the context of an installment contract:

> (a) A licensee under this act shall not charge, contract for, collect, or receive from the buyer, directly or indirectly, any further or other amount for costs, charges, examination, appraisal, service, brokerage, commission, expense, interest, discount, fees, fines, penalties, or other thing of value in connection with the retail sale of a motor vehicle under an installment sale contract in excess of the cost of insurance premiums, other costs, the finance charges, refinance

> charges, default charges, recording and satisfaction fees, court costs, attorney's fees, and expenses of retaking, repairing, and storing a repossessed motor vehicle which are authorized by this act.
> . . . .
> (c) An insurance company, agent, or broker shall not pay or cause to be paid, directly or indirectly, to any installment seller, nor shall any installment seller receive from any insurance company, agent, or broker, any portion of an insurance premium involved in the retail installment sale of a motor vehicle other than for the benefit of the installment buyer, and all payments shall be held by the installment seller in trust for the benefit of the installment buyer and shall be paid to the installment buyer within 30 days, unless used in procuring comparable insurance or credited to matured unpaid installments under the contract as provided in section 16(f).

M.C.L. § 492.131.

Plaintiff asserts that the express terms of this statute indicate that defendant Westborn and its managers acted illegally by earning indirect commissions from the sale of insurance. In support of this argument plaintiff relies upon Attorney General Opinion No. 6330 (1990). Plaintiff interprets this opinion as prohibiting dealerships from receiving "kickbacks" or commissions on the sale of insurance. See Pl.'s Br. Ex. 7.

The court finds that defendant did not violate Michigan laws, by distributing commissions. Plaintiff's reliance on the 1990 Michigan Attorney General Opinion is misplaced because the statutory definition of a "person" was amended in 1996. Before 1996, the definition only included an "employee or agent." Currently, the definition includes "an individual . . . association, corporation . . . or other entity . . . ." M.C.L. §§ 492.102(2) & (4). Further the statute's language has been interpreted to only prohibit a "licensee" or "installment seller," i.e. the dealership itself, from charging the purchaser commissions in connection with a RISC. Thus, commission payments to defendant's employees, including its owner, Moore, did not violate M.C.L. §

492.131(c).[7]

The court agrees with DADA and MADA's contention that the FIB's December 1996 declaratory ruling, pursuant to the Michigan Administrative Procedures Act, M.C.L. § 24.201, is entitled to deference by the court. Therefore, since the FIB's interpretation endorses the operation of dealer related insurance agencies for the purpose of selling Credit Life Insurance in Michigan, there is no prohibition barring the individual owner, Moore, from either receiving commissions or owning Westborn and the Susan Agency.

## IV.  Conclusions

In this matter, the Detroit Auto Dealers Association and the Michigan Automobile Dealers Association filed amicus curiae briefs in support of defendant's position. The court has had an opportunity to review those briefs and concurs with the amicis' position. The briefs highlight Michigan automobile dealers' thirty-year prevailing business practice of selling "gross coverage" credit life insurance. There is no evidence that defendant's actions were impermissible according to all of the relevant laws, policies, and practices. For all of the reasons set forth above the court finds that defendant did not violated any federal or state statutes. Accordingly,

IT IS ORDERED that defendant Westborn's motion for summary judgment is granted.

---

[7] On December 13, 1996, the Commissioner of the FIB, issued a declaratory ruling which concluded that pursuant to the MVSFA, a person's status as a shareholder, director, or officer of a licensed installment seller, is not impaired by owning and profiting from a credit life agency. Further the Commissioner stated that for purposes of the MVSFA, the individual who owns the dealership is not considered the installment seller under the Act. Instead, the dealership, as a corporation, is the installment seller. See DADA Br. at Ex. C.

IT IS FURTHER ORDERED that plaintiff Elsie Webb's motion for summary judgment is denied.

                                             s/Bernard A. Friedman
                                             _____
                                             BERNARD A. FRIEDMAN
                                             CHIEF UNITED STATES DISTRICT JUDGE

Dated: May 11, 2005
       Detroit, Michigan

**I hereby certify that a copy of the foregoing document was served this date upon counsel of record electronically and/or via first-class mail.**

      **_____/s/ Patricia Foster Hommel_____**
            **Patricia Foster Hommel**
     **Secretary to Chief Judge Friedman**